UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ATLUS GROUP US, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:25-CV-1361-B |
| | § | |
| WILLIAM COLE, RON CAUSEY, | § | |
| AND CIRRUS ADVISORS LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court are two motions to dismiss: one filed by Defendants Cirrus Advisors LLC ("Cirrus") and Ron Causey (collectively "Cirrus Defendants") (Doc. 7) and a second filed by Defendant William Cole (Doc. 21). Having reviewed the briefing and applicable law, the Court **GRANTS** the Cirrus Defendants' Motion and **DENIES** Cole's Motion. The Court dismisses all claims against the Cirrus Defendants for lack of personal jurisdiction. All remaining claims will proceed.

### I.

### BACKGROUND

This is a trade-secrets and restrictive-covenants dispute brought by a tax-consulting firm—Altus Group US Inc. ("Altus")—against its former employee Cole and Cole's new employer Cirrus.

Altus is a tax-consulting firm that, until January 2025,[1] offered property tax advisory services. Doc. 1, Compl. ¶ 1. It is incorporated in Delaware and based in New York. *Id.* ¶ 21. Altus employed Cole for ten years, most recently as the practice leader of Altus's Transactional Tax team. *See id.* ¶¶ 2, 13. Cole is a Delaware resident. *Id.* ¶ 22. As a practice leader, Cole had access to a variety of confidential information, including some of Altus's trade secrets. *Id.* ¶ 2. Accordingly, Altus required Cole to sign certain confidentiality agreements and abide by the company's acceptable use policies. *Id.* ¶ 3.

Causey is a Maryland resident. *Id.* ¶ 23. He co-ran a Maryland accounting firm with Cole and others until Altus acquired their firm in late 2014. *See id.* ¶¶ 2, 4. In 2023, Causey decided to form a new business that would provide state and local tax accounting and advisory services. *Id.* ¶¶ 4, 35. Now known as Cirrus—and based in Maryland—Causey's new business is a direct competitor to Altus. *Id.* ¶¶ 4, 24, 35.

As early as 2023, Cirrus began hiring Altus's employees. *Id.* ¶ 7. This included at least seven employees at various levels. *See id.* Cirrus also made a verbal employment offer to Cole. *Id.* ¶ 38. In an effort to retain Cole, Altus offered—and Cole accepted—a salary adjustment package (the "SAP"). *Id.* ¶¶ 39, 49. The SAP provided Cole with increased compensation and continued access to Altus's trade secrets, and in return, Cole agreed to various restrictive covenants, including confidentiality, trade-secrets, non-competition, and non-solicitation provisions. *See id.* ¶¶ 42-48. The SAP also contained choice of law and forum selection provisions, thereby selecting Texas state and federal

---

[1] Altus apparently sold its property tax division in January 2025. Doc. 23, Cole Mot. App. Ex. 1 ¶¶ 3-6 (providing links to Altus and third-party press releases announcing sale). But the parties do not dispute that it maintained a property tax advisory business before that time.

law, and a Texas forum, for resolution of all actions or proceedings arising out of or relating to the SAP. *See* Doc. 1-2, Compl. Ex. 1 ¶ 7.1.

Shortly after signing the SAP, Cole allegedly began surreptitiously transferring confidential files from Altus's servers to a personal device, including client lists, service agreements, and client tax projections. *See* Doc. 1, Compl. ¶¶ 12, 67-72. Among many other things, this included documents related to Altus's Texas business. *See id.* ¶¶ 12, 71. Then, in late-February 2024, Cole gave his two-weeks-notice—announcing his abrupt resignation from Altus. *Id.* ¶ 13. In his final two weeks, Cole allegedly contacted Altus clients, informed them of his impending exit, and invited them to seek out his services at Cirrus—which would soon be new employer. *Id.* ¶¶ 74-75, 79, 81-82. Cole also continued downloading Altus's confidential files to his personal device. *Id.* ¶¶ 16, 83-86.

Shortly after Cole's departure, Altus discovered that Cole had solicited clients and downloaded files to a personal device. *Id.* ¶ 91. They then learned that "some of the clients whose work was detailed in the files that Cole misappropriated . . . took their business to Cirrus." *Id.* Altus alleges that the Cirrus Defendants were aware of and encouraged Cole's actions. *Id.* ¶ 92.

In May 2024 Altus sent Cole and the Cirrus Defendants a cease-and-desist letter, demanding that Cole provide information on his current role with Cirrus. *Id.* ¶¶ 93-94. Among other things, Altus demanded that Cole provide a list of Altus customers and employees he had contacted, provide documentation of such communications, and preserve all evidence of violations of the Contract. *Id.* In response, Cole's attorney informed Altus that Cole had deleted all Altus client information in his possession and would be returning an Altus hard drive. *Id.* ¶ 95.

The parties were apparently unable to come to a resolution, and Altus brought the present suit in May 2025. *Id.* ¶ 96. Against Cole, Altus asserts claims for misappropriation of trade secrets

under both Texas and federal law, breach of contract, and breach of fiduciary duty. *See id.* ¶¶ 97-139. Against the Cirrus Defendants, Altus asserts claims for aiding and abetting Cole's breach of fiduciary duty, tortious interference with a contract, and misappropriation of trade secrets under both Texas and federal law. *See id.* ¶¶ 140-175.

Now, the Cirrus Defendants and Cole move to dismiss Altus's action. The Cirrus Defendants move to dismiss all claims brought against them, contending that this Court lacks personal jurisdiction, venue is improper, and Altus fails to state a claim. Doc. 8, Cirrus Mot. Br., 3. Alternatively, the Cirrus Defendants ask that the Court sever all claims brought against them and transfer those claims to federal court in Maryland. *Id.* at 20. Cole separately moves to dismiss the claims brought against him, contending that Altus lacks standing to bring suit and fails to state a claim. *See* Doc. 22, Cole Mot. Br., 1.

The Court considers both Motions below.

## II.

## LEGAL STANDARD

A. *Legal Standard for Challenges to Subject Matter Jurisdiction*

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a plaintiff's complaint for "lack of subject-matter jurisdiction." Once the defendant files their Rule 12(b)(1) motion and challenges jurisdiction, "the party invoking jurisdiction has the burden to establish subject matter jurisdiction." *Smith v. Am. Pain & Wellness, PLLC*, 747 F. Supp. 3d 989, 996 (E.D. Tex. 2024) (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted).

Lack of subject-matter jurisdiction can be based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (citation omitted).

"It is well settled that 'the issue of standing is one of subject matter jurisdiction.'" *Harding v. Cnty. of Dall.*, 336 F. Supp. 3d 677, 684 (N.D. Tex. 2018) (Fitzwater, J.) (quoting *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006)), *aff'd*, 948 F.3d 302 (5th Cir. 2020). The doctrine of standing addresses the question of who may properly bring suit in federal court. It is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must meet both constitutional and prudential requirements for federal courts to exercise their jurisdiction. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161 (citation omitted).

B. *Legal Standard for Challenges to Personal Jurisdiction*

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move to dismiss a plaintiff's complaint for "lack of personal jurisdiction." "When personal jurisdiction is challenged, the plaintiff bears the burden of establishing the district court's jurisdiction over the defendant." *Quick Techs., Inc. v. Sage Grp.*, 313 F.3d 338, 343 (5th Cir. 2002) (internal quotation marks and citation omitted).

In the absence of a federal rule or statute establishing another basis, "personal jurisdiction in federal court is governed by the law of the state in which the federal court sits." *See Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of Cal.*, 1 F.4th 346, 351 (5th

Cir. 2021). "In Texas, courts evaluate personal jurisdiction over nonresident defendants through a two-step inquiry, ensuring compliance with the state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." *Id.* However, because Texas's long-arm statute is "coextensive with the Due Process Clause, the two inquiries merge" into a single constitutional due process inquiry. *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (citation omitted).

Under the Due Process Clause of the Fourteenth Amendment, a defendant must have "minimum contacts with the forum state such that imposing a judgment would not offend traditional notions of fair play and substantial justice." *Id.* (internal quotation marks and citation omitted). This analysis, which focuses on "the defendant's relationship to the forum State" recognizes two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (citations omitted).

C. *Legal Standard for Challenges that a Plaintiff Failed to State a Claim*

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nevertheless, in considering whether the plaintiff has stated a claim, courts "must accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

## III.

## ANALYSIS

The Court first addresses Cole's challenge to Altus's standing and this Court's subject-matter jurisdiction. Finding that Altus has standing and the Court has subject-matter jurisdiction, the Court moves on to address whether it has personal jurisdiction to hear Altus's claims against the Cirrus Defendants. The Court finds that it lacks personal jurisdiction over the Cirrus Defendants, **GRANTS** the Cirrus Defendants' Motion, and **DISMISSES** all claims asserted against the Cirrus Defendants without prejudice. The Court then considers whether Altus fails to state its remaining claims. Finding that Altus properly stated each cause of action against Cole, the Court **DENIES** Cole's Motion.

A.    *Altus Has Standing to Assert its Claims.*

Cole first contends that Altus lacks prudential standing to assert its claims. *See* Doc. 22, Cole Mot. Br., 6-8.

For prudential standing "a plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (citing *United States v. Johnson*, 632 F.3d 912, 919-20 (5th Cir. 2011)). [2] "A motion to dismiss for lack of standing may be either 'facial' or 'factual.'" *Id.* at 504. Relevant here, in a factual challenge, the defendant "submits

---

[2] Altus contends that prudential standing arguments should be evaluated under 12(b)(6) as a failure to state a claim, not under 12(b)(1). *See* Doc. 31, Resp. Br., 10. In doing so, Altus misunderstands the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.* 572 U.S. 118 (2014). There, the Supreme Court found that "zone of interest" challenges are not prudential and are more properly understood as substantive challenges—thus properly evaluated under 12(b)(6)—but its decision has no impact on other traditional prudential standing arguments. *See id.* at 126-27; *see also Superior MRI Servs., Inc*, 778 F.3d at 506 ("[T]he *Lexmark* holding deals only with the zone-of-interests test and not with the requirement that a party assert its own rights.").

affidavits, testimony, or other evidentiary materials" to show that standing (and thereby subject-matter jurisdiction) is lacking, and a plaintiff then "must prove the existence" of standing and subject-matter jurisdiction "by a preponderance of the evidence." *Id.* (citations omitted).

Here, Cole—bringing a factual attack—submits evidence that in January 2025, Altus sold its property tax services business to a third party. *See* Doc. 22, Cole Mot. Br., 7; Doc. 23, Cole Mot. App. Ex. 1 ¶¶ 2-4 (providing links to Altus's and third-party's press releases announcing sale). Cole claims that this sale necessarily included "any related causes of action so the purchaser could protect the business it acquired," meaning Altus sold its interest in the present action to a third party and no longer has a right to assert it. Doc. 22, Cole Mot. Br., 7. However, Cole provides no evidence to suggest that the sale included Altus's right to bring suits related to events occurring *before* the sale itself. As Altus points out, its claims for relief arose out of events occurring in 2024—a year before the sale of their property tax business took place. *See* Doc. 31, Resp. Br., 10.

To argue that Altus sold away the claims asserted here, Cole relies on *Superior MRI*, where the Fifth Circuit dismissed a claim on prudential standing grounds because the plaintiff could not show that it had been assigned a third-party's contractual claims by its predecessor in interest. *See* 778 F.3d at 503-04. Though prudence might require a purported transferee to show that it was assigned its injured predecessor's right to sue, that prudential requirement does not apply in the reverse. The originally injured party is presumed to have standing and need not prove that it has *not* transferred its right to sue. Thus, *Superior MRI* does not help Cole's case and demonstrates the opposite point: that without clear evidence that the originally injured party assigned its rights, courts should presume the assignment did not occur. *See id.*

The mere fact that Altus sold its property tax division in 2025, without more, is insufficient evidence to suggest that Altus lacks standing to assert claims that accrued in 2024. *Cf. Prather v. Neva Paperbacks*, 410 F.2d 698, 700 (5th Cir. 1969) (finding that a "mere assignment of a copyright does not of itself transfer to the assignee any cause of action for infringements that occurred prior to the assignment"). As Cole's evidence does not show that Altus lacks standing, his facial attack fails. Thus, the Court finds that Altus has standing to bring its claims against Cole, and the Court has subject-matter jurisdiction over the claims presented.

B.     *The Court Lacks Personal Jurisdiction Over The Cirrus Defendants Because They Lack Sufficient Contacts with the Forum.*

The Cirrus Defendants contend that this Court lacks personal jurisdiction over them as to each of Altus's claims. Doc. 8, Cirrus Mot. Br., 7-11. Altus concedes that the Court lacks general personal jurisdiction over the Cirrus Defendants but argues that this Court has specific personal jurisdiction due to the Cirrus Defendants' actions as alleged in the Complaint. Doc. 26, Pl.'s Resp. Br., 3-4.

To review for specific personal jurisdiction, the Fifth Circuit follows a three-step analysis: (1) whether the defendant "purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there," (2) whether the case "arises out of or results from the defendant's forum-related contacts," and (3) whether the "exercise of personal jurisdiction is fair and reasonable." *Bulkley*, 1 F.4th at 351 (citations omitted). "If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). When personal jurisdiction is based on specific jurisdiction, plaintiffs must show specific jurisdiction with respect to each individual claim asserted. *See id.* at 274-75.

The Court's first step in determining whether it has specific personal jurisdiction over the Cirrus Defendants is considering whether the Cirrus Defendants have taken "some act by which [they] purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State." *Ford*, 592 U.S. at 359 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The contacts must be [the Cirrus Defendants'] own choice and not random, isolated, or fortuitous." *Id.* (internal quotation marks and citation omitted). Importantly here, the focus "is on [the *Cirrus Defendants'*] *contacts with the forum state*, not on fortuitous contacts the defendant might have *with* [a] *plaintiff*" who happens to have a connection to the forum state. *See Lee v. OfferUp, Inc.*, No. CV 17-1609, 2018 WL 4283371, at *2 (E.D. La. Sept. 7, 2018) (citation omitted) (emphasis added); *see also Giri v. Integrated Lab. Sys., Inc.*, No. 3:16-CV-332, 2017 WL 3278058, at *2 (S.D. Tex. Apr. 12, 2017) ("Minimum contacts based upon purposeful direction or availment must be based on the defendant's—and not the plaintiff's—relationship with the forum state."(citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

With the above principals in mind, the Court evaluates the Cirrus Defendants' contacts with Texas—the forum state here. Altus identifies two "contacts" that it argues provide the Court with specific personal jurisdiction over the Cirrus Defendants. First, Altus contends that the Cirrus Defendants "knew that Cole was restricted by an Agreement that was expressly governed by Texas law," that any "dispute[s] arising from Cole's breach of that Agreement would be heard in Texas." Doc. 26, Resp. Br., 7. And second, Altus claims that the Cirrus Defendants obtained certain confidential information from Cole that they could have misappropriated—some of which included Altus's clients and work in Texas. *Id.* In other words, the Cirrus Defendants' purported contacts

with Texas are (1) their interference with the SAP itself and (2) the possible effects of that interference with Altus's Texas business. The Court addresses each alleged contact in turn.

    1.  <u>The Cirrus Defendants' Contacts with the SAP Do Not Establish Minimum Contacts with the Forum.</u>

While a contract alone cannot "automatically establish sufficient minimum contacts" between a forum and a nonresident defendant, parties to a contract with a forum selection clause generally waive any challenges to personal jurisdiction in the contractually designated forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 473 n.14 (1985). The Cirrus Defendants are not parties to the SAP and are not bound by its forum selection clause. Thus, Altus cannot rely on waiver to establish specific personal jurisdiction over the Cirrus Defendants.[3]

As its next option, Altus contends that the Cirrus Defendants purposefully availed themselves of a Texas forum by employing Cole in violation of the SAP because they "knew that Cole was restricted by an Agreement that was expressly governed by Texas law . . . and that any dispute arising from Cole's breach of that Agreement would be heard in Texas." Doc. 26, Resp. Br., 7. In doing so, Altus improperly considers the Cirrus Defendants' contacts with the SAP and its parties as contacts with Texas. But the minimum contacts inquiry focuses on the defendant's "contacts with the forum state, not on fortuitous contacts the defendant might have with [a]

---

[3] A forum selection clause has at times been used to find personal jurisdiction over non-signatories where they are "closely related" to signatories to the contract. *See Princess Cruise Lines, Ltd. v. Walltopia Adventure USA, LLC*, No. 4:24-CV-745, 2025 WL 2677097, at *5 (E.D. Tex. Sept. 18, 2025). However, the "closely related doctrine" applies only where the non-signatory is so "closely related to the dispute such that it becomes foreseeable that it will be bound." *Id.* (citation omitted). Courts determine whether non-signatories are closely related by considering "(1) common ownership between the signatory and the non-signatory, (2) direct benefits obtained from the contract at issue, (3) knowledge of the agreement generally[,] and (4) awareness of the forum selection clause particularly." *Id.* (citation omitted). Here, aside from general allegations that the Cirrus Defendants were aware of the SAP, Altus does not argue or allege facts to suggest that Cole and the Cirrus Defendants are so "closely related" that the Cirrus Defendants should be bound to the SAP or its forum selection clause in particular. As such, the Court does not consider this argument further.

plaintiff" who has a connection to the forum. *See Lee*, 2018 WL 4283371, at *2. Thus, the Cirrus Defendants' alleged awareness of Cole's violation of the SAP and its forum selection clause does not amount to sufficient contacts with Texas.

Altus identifies three cases where courts have relied on contracts to establish personal jurisdiction over non-resident defendants who interfered with—but were not parties to—those contracts. But none of Altus's cited cases bases personal jurisdiction *entirely* on a contract or the contract's forum selection clause, and each case appears to be instead applying some version of the Supreme Court's "effects test"—which the Court discusses below. In each case, the plaintiff was itself a Texas corporation, such that the alleged interference was necessarily directed at a Texas business relationship. *See Kwik-Kopy Corp. v. Byers*, 37 F. App'x 90, at *6 (5th Cir. 2002) (explaining that the defendant's tortious interference— "specifically directed at [the plaintiff], a *Texas Corporation*"—would necessarily "[a]ffect trade secrets, customers, and ultimately revenue" in Texas, and would result in financial losses that "would obviously be incurred in Texas"); *Stelluti Kerr, LLC v. MAPEI Corp.*, No. 5:10-CV-030-C, 2010 WL 11530848, at *5 (N.D. Tex. June 22, 2010) (Cummings, J.) (noting that the plaintiff was based in Texas and "some of the fruits" of the defendant's tortious activities occurred there); *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003) (noting that the plaintiff was based in Texas and Texas was the "primary location" of the interfered-with "business relationship").

In short, each of Altus's cases involves a Texas-based plaintiff and allegations of specific harms felt in Texas. Altus does not make that showing here. Altus is incorporated in Delaware and based in New York. Doc. 1, Compl. ¶ 21. Cole is a Delaware resident. *Id.* ¶ 22. The Cirrus Defendants are based in Maryland. *Id.* ¶¶ 23-24. The only concrete connection to Texas in this case

is the SAP's forum selection clause, which selects Texas law. *See* Doc. 1-2, Compl. Ex. 1 ¶ 7.1.[4] But the Court cannot subject the Cirrus Defendants to a Texas forum based solely on a fortuitous forum selection clause, *see Ford*, 592 U.S. at 359, found in an agreement to which the Cirrus Defendants are neither parties nor direct beneficiaries. To hold otherwise would undermine the values from which personal jurisdiction is derived to "ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Id.* at 360 (citation omitted).

    2.  <u>Altus Fails to Establish Minimum Contacts Through the Supreme Court's Effects Test.</u>

Where a plaintiff alleges an intentional tort committed by a nonresident defendant, courts have sometimes found the necessary "minimum contacts" for personal jurisdiction when the tort's effects are clearly directed at the forum. *See Source Network Sales & Mktg., LLC v. Ningbo Desa Elec. Mfg. Co., Ltd.*, No. 3:14-CV-1108-G, 2015 WL 2341063, at *4 (N.D. Tex. May 15, 2015) (Fish, S.J.) (citation omitted). This is known as the "effects test," based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *See id.* However, to establish minimum contacts this way, (1) the defendant must have committed an intentional tort or business tort, (2) the plaintiff must have "felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the resulting harm to the plaintiff," and (3) the defendant must have "expressly aimed his conduct at the forum, so that the forum can be said to be the focal point of the tortious activity." *Id.* at *5 (citation omitted).

---

[4] In response to the Cirrus Defendants' Motion to Dismiss, Altus claims for the first time that the agreement was executed in Texas. *See* Doc. 26, Resp. Br., 8. Because this allegation is not found in the Complaint or supported with any evidence whatsoever, the Court will not consider it. *See Hearn v. Deutsche Bank Nat'l Trust Co.*, No. 3:13-CV-2417-B, 2014 WL 4055473, at *4 n.3 (N.D. Tex. Aug. 15, 2014) (Boyle, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

Altus does not argue that it felt the brunt of the alleged harm in Texas or that the Cirrus Defendants "expressly aimed" their conduct at Texas. While Altus alleges that Cole misappropriated a variety of confidential documents, including some involving Altus's Texas clients, *see* Doc. 1, Compl. ¶¶ 12, 71, it critically does not allege that the Cirrus Defendants have misappropriated any of Altus's Texas-related documents, or even that the Cirrus Defendants' actions had any effect on Altus's Texas business. At best, Altus implies the mere *possibility* that the Cirrus Defendants have confidential information related to its Texas business, but it does not allege any actual harm felt in Texas. Thus, the *Calder*'s effects test also cannot form the basis for this Court's personal jurisdiction over the Cirrus Defendants.

Because Altus fails to identify sufficient contacts by which the Cirrus Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within" Texas, *Ford*, 592 U.S. at 359, this Court lacks personal jurisdiction over Altus's claims against the Cirrus Defendants. Accordingly, the Court **DISMISSES** those claims without prejudice. The Cirrus Defendants' remaining requests for dismissal and transfer are **DENIED AS MOOT**.

C.     *Altus Has Stated Claims for Trade Secret Misappropriation, Breach of Contract, and Breach of Fiduciary Duty.*

Under Rule 12(b)(6), Cole seeks dismissal of each cause of action asserted against him for failing to state a claim. The Court considers Altus's misappropriation claims together, followed by Altus's breach of contract and breach of fiduciary duty claims.

    1.     <u>Altus States Claims for Trade Secret Misappropriation Under Both Federal and Texas Law.</u>

Altus asserts claims against Cole for misappropriation of trade secrets under both the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"). *See* Doc. 1,

Compl. ¶¶ 97-120. "Because claims for trade secret misappropriation under the [DTSA] and [TUTSA] require proof of similar elements . . . courts generally analyze them together." *Su v. Gaya Won, LLC*, No. 4:23-CV-3215-H, 2024 WL 5301787, at *9 (S.D. Tex. Dec. 23, 2024), *report and recommendation adopted*, No. 4:23-CV-3215-H, 2025 WL 50261 (S.D. Tex. Jan. 7, 2025). Accordingly, the Court evaluates both misappropriation claims asserted against Cole together.

Under either statute, Altus must allege "(1) the existence of trade secrets; (2) misappropriation; and (3) use without consent." *Caliber Home Loans, Inc. v. Cove*, No. 3:22-CV-02298-M, 2025 WL 71983, at *17 (N.D. Tex. Jan. 10, 2025) (Lynn, S.J.) (other citations omitted). By their language, both statutes also require that the plaintiff own the trade secrets at the time of the misappropriation. *See* 18 U.S.C. § 1836(b)(1): Tex. Civ. Prac. & Rem. Code § 134a.002(3-a). Cole contends that Altus does not state a claim for misappropriation because (1) Altus does not allege Cole's use of the trade secrets, and (2) Altus no longer owns the trade secrets. Doc. 22, Cole Mot. Br., 8-11. The Court addresses each argument in turn.

      i.      *Altus sufficiently pleaded that Cole used its trade secrets without consent.*

The Fifth Circuit requires a plaintiff to allege that the defendant actually "used the trade secret without authorization." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018) (emphasis and citation omitted). "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a use." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013) (brackets, internal quotation marks, and citation omitted). "[R]elying on the trade secret to assist or accelerate research or development, or

soliciting customers through the use of information that is a trade secret . . . all constitute 'use.'" *Id.* (citing *Gen. Universal Sys., Inc. v. HAL Inc.*, 500 F.3d 444, 451 (5th Cir. 2007)).

Altus has sufficiently pleaded allegations that Cole used Altus's trade secrets without authorization. In his final days employed with Altus, Cole allegedly solicited several Altus clients. Specifically, Cole told one client in an email that "in light of [his] impending departure from Altus . . . and [his] intimate knowledge" of the client, he would be "happy to continue" the client relationship with future tax matters and could "retain a copy of [the client's] files in [his] personal database for future reference." Doc. 1, Compl. ¶ 74. The client responded that it "absolutely and explicitly want[ed] [Cole] to retain a copy of [the client's] files in your personal [database] for future reference." *Id.* ¶ 75. Cole then confirmed that he would "begin copying the files" that weekend. *Id.* Trade secrets generally include "compilation[s] of information used in one's business . . . which give[] an opportunity to obtain an advantage over competitors who do not know" the information, *Wellogix*, 716 F.3d at 874. And Cole does not dispute that Altus's client files and data are trade secrets. Thus, Cole used Altus's trade secrets to "solicit customers through the use of information that is a trade secret." *See id.* at 877.

> ii.      *Altus sufficiently pleaded that it owned the trade secrets at issue at the time of Cole's violation.*

Cole argues that because Altus sold their property tax business to a third-party in 2025, they do not own the trade secrets at issue here. Doc. 22, Cole Mot. Br., 10-11.[5] However, Altus's alleged misappropriation claim accrued in 2024, when Cole misappropriated trade secrets that Altus then

---

[5] While this argument relies on facts not asserted in the Complaint, the Court takes judicial notice that Altus sold its property tax division to a third party in 2025. *See Knox v. Rosenberg*, No. CIV.A. H-99-0123, 1999 WL 35233291, at *6 (S.D. Tex. Sept. 28, 1999) ("In the Rule 12(b)(6) context, a court may consider judicially noticeable facts . . . .").

undisputably owned. *See* Doc. 1, Compl. ¶¶ 67-91. And Altus does not seek damages for any post-sale misappropriation. *See* Doc. 31, Resp. Br., 14. The fact that a trade secret no longer belongs to a plaintiff does not absolve a defendant's past misappropriation of wrongdoing. *Cf. Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 822 n.1 (E.D. Tex. 2009) (noting that when a trade secret loses its protection because it enters the public domain, this does not "absolve [a defendant of] past wrongful usage thereof" if it was still a trade secret "at the time of the alleged misappropriation" (citations omitted)).

For the reasons stated above, Altus properly states claims for misappropriation of trade secrets under the DTSA and TUTSA.

2.  <u>Altus States a Claim for Breach of Contract.</u>

Under the Texas Business and Commerce Code, restrictive covenants such as covenants not to compete are enforceable only if they are "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made" and "do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." § 15.50(a). Because Altus's breach of contract claim alleges that Cole violated non-competition and non-solicitation provisions of the SAP, Cole asserts Altus failed to state a claim because (1) the provisions are unenforceable due to Altus's lack of "goodwill or other business interest" in the now-sold property tax division and (2) because the SAP is not an "otherwise enforceable agreement" due to the lack of consideration. Doc. 22, Cole Mot. Br., 11-15. For the reasons explained below, the Court finds both arguments unconvincing.

Addressing Cole's first argument, the fact that Altus sold its property tax division in 2025 does not affect the enforceability of the non-competition and non-solicitation provisions for alleged

breaches that occurred while Altus still owned the business. While section 15.50(a) does require the restrictive covenants at issue to be "necessary to protect [Altus's] goodwill or business interest," Cole does not dispute that the provision operated to protect what was still Altus's goodwill or business interest in early 2024—when Cole allegedly breached the covenant. Thus, Cole's argument against enforceability fails.

Now addressing Cole's second argument, the Court finds that as pleaded, the SAP was an enforceable agreement supported with valid consideration. Section 15.50(a) requires that "a covenant not to compete be ancillary to an otherwise enforceable agreement." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011) (citing § 15.50(a)). "Ancillary to" requires only that the restrictive covenant be "supplementary" or "part of" an "otherwise enforceable agreement." *Id.* (citation omitted). Like any agreement, an "otherwise enforceable agreement" under section 15.50 requires valid consideration. *See id.* at 773.

In the context of an existing employment relationship, any new agreement, or modifications to existing employment terms, requires new consideration. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 654 (Tex. 2006). Otherwise, the new agreement is illusory and will not be enforceable. *Id.* In the context of at-will employment, an employer's promises of consideration in the future—such as increased salary, provision of confidential information, or specialized training—is generally illusory if the employer is not obligated to provide the consideration immediately upon execution. *Id.* at 650. This is because the employer could simply terminate the at-will employee later to avoid providing the proposed consideration. *See id.* Nevertheless, such "illusory" agreements can "become[] enforceable after the agreement is made" if the employer subsequently provides the promised consideration. *Id.* at 655; *see Marsh*, 354 S.W.3d at 778 (reaffirming the same). Thus,

restrictive covenants are ancillary to an "otherwise enforceable agreement" under section 15.05(a) so long as the employer provides the promised consideration—either upon execution or at a later date. *See id.*

The restrictive covenants at issue here form part of the SAP. Cole was already an Altus employee at the time—so Altus was required to have offered something beyond a mere continuation of the employment relationship to enforce the new employment terms. *See Sheshunoff*, 209 S.W.3d at 654. As alleged, Altus offered consideration in the form of "continued employment with Altus; a salary increase and bonus eligibility; healthcare benefits; and access to confidential information." Doc. 1, Compl. ¶ 123. The SAP itself provides that Cole would "acquire information ('Trade Secrets[']) about certain matters which are confidential to the employer." Doc. 1-2, Compl. Ex. 1 ¶ 3.1. Altus does not allege whether Cole actually *received* new confidential information since signing the SAP.

Altus's promises of continued employment, increased compensation, employee benefits, and access to confidential information were likely illusory—at least at the time of execution. *See Sheshunoff*, 209 S.W.3d at 650 (finding that an agreement was "illusory" because the employer "could fire [the employee] after the agreement was signed, and before it provided any [of the consideration identified]"). However, even an illusory promise can become binding and enforceable, and thereby render enforceable a restrictive covenant, if the employer later performs under the agreement. *See id.* at 655. Thus, the Court must determine whether Altus alleged sufficient facts to suggest that it actually provided any consideration.

Altus and Cole executed the SAP on January 9, 2024. Doc. 1, Compl. ¶ 67. His last day of employment was on March 15, 2024. *See id.* ¶ 73. While the Court presumes that Altus compensated

Cole at the new SAP-imposed salary rate in that period, it is doubtful that this amounted to valid consideration. Altus was free to terminate Cole at any time and thus was only required to pay him at the newly contracted rate for as long as it determined to employ him. However, Altus also promised Cole access to a wide variety of trade secrets and confidential information—including customer lists, products under development, business plans, and forecasts. *See* Doc. 1-2, Compl. Ex. 1 ¶ 3.1. Cole plainly had access to these same types of trade secrets prior to the SAP. *See* Doc. 1, Compl. ¶ 58. *To that extent*, Altus's promises amount to past consideration and will not render the SAP enforceable. *See, e.g., Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.–Austin 2004, pet. denied). But trade secrets such as customer lists, product developments, and business forecasts are in constant development and modification. If Cole received access to any *new* trade secrets in his final two months of employment, the SAP is likely enforceable. *See Sheshunoff*, 209 S.W.3d at 655. The Court must construe all facts and draw all reasonable inferences in Altus's favor at this stage. *See Lormand*, 565 F.3d at 232. Because the SAP provided Cole with access to any new trade secrets made available in his final two months employed, Cole more likely than not received access to at least some new trade secrets during that time.[6] Thus, Altus sufficiently pleaded that Cole received consideration and that the SAP is enforceable.

For the reasons stated above, Cole's arguments are unavailing, and Altus properly states a claim for breach of contract.

---

[6] To hold otherwise, the Court would have to make other inferences in favor of the *moving party*—that Cole could not have accessed new trade secrets in his final two months, or that Altus could not have created or received new trade secrets during that span. These inferences, absent evidence in support, are improper at the motion to dismiss stage.

3.    Altus States a Claim for Breach of Fiduciary Duty.

A claim for breach of fiduciary duty requires: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Caliber Home Loans*, 2025 WL 71983, at *12 (citation omitted). "Under Texas law, an employee may prepare to go into competition with his employer before resigning without breaching [his] fiduciary duty, but may not act for the employee's future interest at the expense of the employer by a course of conduct designed to hurt the employer." *Trueblue, Inc. v. DeRuby*, No. 3:18-cv-0192-M, 2018 WL 1784523, at *2 (N.D. Tex. Apr. 13, 2018) (Lynn, C.J.) (citing *Johnson v. Brewer & Pritchard, PC*, 73 S.W.3d 193, 199 (Tex. 2002)). Cole contends that because Altus asks the Court to infer that the alleged breach of fiduciary duty caused Cole and Cirrus's success in obtaining certain clients, Altus's claim is conclusory and thus deficient. *See* Doc. 22, Cole Mot. Br., 15; Doc. 32, Cole Reply, 9.

The Court disagrees. First, Altus has adequately pleaded facts to support, and Cole does not challenge, that Cole had a fiduciary relationship with Altus as its employee. Second, Cole breached that relationship when he allegedly solicited Altus's existing clients while still an Altus employee. *See* Doc. 1, Compl. ¶ 74; *Trueblue*, 2018 WL 1784523, at *2. And third, Cole both harmed Altus and benefited himself. He downloaded multitudes of company documents—including client files—to his personal device, *see* Doc. 1, Compl. ¶ 89, and among Altus's clients whose documents Cole downloaded, some took their future business to Cirrus, *id.* ¶ 91. These allegations are more than sufficient for the Court—drawing a reasonable inference in Altus's favor, *see Lormand*, 565 F.3d at 232—to conclude that Cole's alleged breach resulted in harm to Altus and benefit to himself. Altus therefore has properly stated a claim for breach of fiduciary duty.

## IV.

## CONCLUSION

In sum, the Cirrus Defendants' Motion to Dismiss (Doc. 7) is **GRANTED**. Altus's claims asserted against the Cirrus Defendants are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction. Cole's Motion to Dismiss (Doc. 21) is **DENIED**. Altus's claims asserted against Cole will proceed. Cole must file his answer within **14 days** of the date of this Order.

**SO ORDERED.**

**SIGNED: March 10, 2026.**

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE